UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROL HERCEG,<br><br>           Plaintiff,<br><br>      v.<br><br>HARTFORD LIFE & ACCIDENT INSURANCE COMPANY, COMPUTER SCIENCES CORPORATION ("CSC") GROUP INSURANCE PLANS,<br><br>           Defendants. | No. CV 08-8117 PA (VBKx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

      This is an Employee Retirement Income Security Act ("ERISA") action for recovery of long-term disability benefits. Plaintiff Carol Herceg ("Plaintiff") seeks benefits under a group insurance policy issued to Computer Sciences Corporation ("CSC") by Hartford Life and Accident Insurance Company ("Hartford"). On September 8, 2009, following the filing of the Administrative Record and briefing by the parties, the Court, sitting without a jury, conducted a bench trial. Having considered the materials submitted by the parties and reviewed the evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a):

I.     **Factual and Procedural Background**

Plaintiff, who is now 60 years old, was employed by CSC for eleven years as a senior finance manager. As a CSC employee, Plaintiff had purchased short term disability ("STD") and long term disability ("LTD") coverage through Hartford. The STD policy featured a 30 day elimination period and the LTD policy had a 180 day elimination period. (Administrative Record ("AR") 96.) The STD policy provides a weekly benefit of 60% of pre-disability earnings for a maximum of 26 weeks. (AR 105.) The STD policy defines "Total Disability" and "Totally Disabled" as meaning "that you are prevented by: 1. accidental bodily injury; 2. sickness; 3. Mental Illness; 4. Substance Abuse; or 5. pregnancy, from performing the essential duties of your occupation, and as a result, you are earning less than 20% of your pre-disability Weekly Earnings." (AR 115.) The STD policy states that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (AR 113.)

Plaintiff was first treated for back pain by Dr. Curtis Spencer, an orthopedic surgeon, in 1997. (AR 98.) In October 2007, Plaintiff returned to Dr. Spencer with complaints of chronic lower back pain and intermittent pain in her left leg. (AR 87.) An x-ray revealed multilevel degenerative disc disease. (AR 87.) Dr. Spencer prescribed anti-inflammatory medication and recommended that Plaintiff begin physical therapy. (AR 87.) Dr. Spencer also ordered an MRI that revealed discogenic disease between the L5 and S1 vertebrae with mild bilateral foraminal stenosis and mild to moderate central canal stenosis in the L3 to L5 region. (AR 84-85.)

Plaintiff saw Dr. Spencer again on December 5, 2007. At that time, Plaintiff was suffering a moderate amount of pain. (AR 87.) Dr. Spencer believed that Plaintiff would be a candidate for injection therapy, but first decided to "hold her out of work for a couple of weeks" to see if her condition improved. (AR 87.) Plaintiff took a medical leave beginning on January 18, 2008. (AR 96.) Plaintiff next saw Dr. Spencer on February 6, 2008. Following that visit, Dr. Spencer reported that Plaintiff experienced "some relief with being off work" but that she was "really having a difficult time doing any significant sitting." (AR

1  86.) Dr. Spencer concluded that he did not "believe this is something she is going to be able
2  to function with. I am going to continue to hold her off work and re-evaluate her in a
3  month's time." (AR 86.) At Plaintiff's March 6, 2008 appointment with Dr. Spencer,
4  Plaintiff reported that she had improved "a little bit" since being off work, but did not think
5  she would be able "to continue with the kind of work that she does." (AR 86.) Dr. Spencer
6  opined that he thought "this is not unreasonable with her degenerative condition and she
7  should probably find a job more in a consulting position where she has the ability to move
8  around freely." (AR 86.)

9        Plaintiff filed a claim for STD benefits with Hartford on April 8, 2008. (AR 96.) On
10 the attending physician's statement submitted with Plaintiff's claim, Dr. Spencer stated that
11 Plaintiff was "unable to sit for prolonged time, needs ability to move around freely." (AR
12 98.) Dr. Spencer expected that Plaintiff would be able to return to work in two months, but
13 was not sure if she would be able to resume her full duties when she returned. (AR 96.) In
14 processing Plaintiff's claim, Hartford sent a letter to Dr. Spencer on April 10, 2008 asking
15 him to forward his office notes from January 18, 2008 to the present and all tests or studies.
16 (AR 93.) Hartford also asked Dr. Spencer to verify what had changed in Plaintiff's
17 condition that she could not work as of January 18, 2008, what specific limitations prevented
18 Plaintiff from working, and to describe her current treatment plan. (AR 93.)

19       Hartford received Dr. Spencer's response to its inquiries on April 14, 2008. (AR 15,
20 89.) Specifically, Dr. Spencer stated that Plaintiff was first treated in 1997 and returned in
21 October 2007 for chronic low back pain that had become "more frequent and consistent."
22 (AR 89.) Dr. Spencer explained that Plaintiff "has difficult time doing any significant
23 sitting–no prolonged sitting, needs ability to move around freely." (AR 89.) Dr. Spencer
24 notified Hartford that he had prescribed medication and "physical therapy for truncal
25 stabilization." (AR 89.) Because Hartford had only asked for his office notes beginning on
26 January 18, 2008, Dr. Spencer forwarded copies of his February 6, 2008 and March 6, 2008
27 office notes. (AR 89-91.) Hartford then determined that it needed additional information
28 and telephoned Dr. Spencer's office requesting his complete office notes and Plaintiff's

1   imaging studies. (AR 14-15.) On April 17, 2008, Hartford notified Plaintiff of its need for
2   this additional information and explained that it would close the claim if Dr. Spencer did not
3   respond by April 30, 2008. (AR 14.)

4         The medical information provided by Dr. Spencer was reviewed by Hartford, first by
5   a claims analyst and then a registered nurse. (AR 13-14.) The claims analyst incorrectly
6   noted that Plaintiff's "[f]unctional impairment unclear as [claimant] worked with condition
7   since [diagnosis] of 10/07." (AR 13.) This was incorrect because Plaintiff stopped working
8   on January 18, 2008. The nurse who reviewed the file erred when she commented that
9   Plaintiff "stopped working on 1/17/08, however, was not seen by [the attending physician]
10  until 2/6/08." (AR 13.) In fact, Dr. Spencer had seen Plaintiff in October and December of
11  2007, and during the December 2007 visit, had recommended that Plaintiff take time off
12  from work. Therefore, to the extent Hartford believed that Plaintiff had stopped work before
13  consulting with Dr. Spencer, an argument repeated in Hartford's Reply Trial Brief,[1/]
14  Hartford was and is mistaken.

15        The nurse opined that a physical demands analysis ("PDA") would be beneficial. (AR
16  13.) CSC returned the completed PDA to Hartford on April 30, 2008. (AR 77.) However,
17  on April 29, 2008, prior to receiving the PDA, Hartford's claims examiner had already
18  recommended that Plaintiff's claim be denied. (AR 12.) Once it arrived, the PDA disclosed
19  that Plaintiff's job required her to sit for three hours at a time and that it was typical for her
20  to sit for seven hours a day. (AR 78.) Plaintiff would walk a half-hour each day and stand
21  for another half-hour during a typical work day. (AR 78.) According to CSC, Plaintiff
22  could alternate sitting and standing as needed, but the job could not be modified. (AR 78.)
23  After reviewing the PDA, Hartford's examiner reiterated her initial conclusion and denied
24  Plaintiff's claim. (AR 11.)

---

27  [1/]    See Hartford's Reply Trial Brief at 3 ("Indeed, it does not appear that Dr. Spencer
28  was even aware of Herceg's unilateral decision to go out on disability in January of 2008 before it occurred.").

Hartford's May 1, 2008 letter denying Plaintiff's claim cited the STD policy's definition of "Total Disability" and reviewed the information considered by Hartford.  (AR 74-76.)  Hartford concluded that:

> Disability is established when there is impairment to your function that renders you unable to perform the essential duties of your occupation.  Although you continue to have complaints of back pain and are receiving treatment, you stopped working 1/18/08 but were not seen by Dr. Spencer until 2/6/08.  Dr. Spencer indicated treatment as medication and physical therapy, however, physical therapy notes have not been provided and there is no mention of therapy in the 2008 office visit notes.  This would not indicate a level of treatment consistent with a severity of symptoms that would preclude functioning.  The Physical Demands Analysis received from your employer on 4/30/08 indicates that your job includes a sit stand option and the restrictions of no prolonged sitting and ability to move around freely are within the scope of your job.  We are not disputing your reported symptoms.  However, reported symptoms and treatment alone is not indicative of a disability.  The medical evidence must be able to substantiate a functional impairment that would prevent you from working.

(AR 75.)  Hartford's letter informed Plaintiff of her right to seek an appeal and advised her that if she chose to appeal, Hartford would review her entire claim, including any new information received with her appeal.  (AR 76.)

Plaintiff wrote to Hartford on June 6, 2008 appealing Hartford's denial of her STD claim.  (AR 70-72.)  In her appeal, Plaintiff included contact information for her physical therapist but did not forward any physical therapy records.  (AR 70-72.)  Hartford's appeal specialist reviewed Plaintiff's appeal letter and the file and determined that Hartford should

ask Dr. Spencer to opine about the PDA's indication that Plaintiff could alternate sitting and standing. (AR 8-9.) Hartford wrote to Dr. Spencer on June 27, 2009 asking if Plaintiff "is capable of performing a sedentary occupation which includes the ability to alternate sitting and standing as needed?" (AR 29.) Dr. Spencer was asked to provide his clinical rationale if his answer was "no." (AR 29.) When Hartford did not receive a response from Dr. Spencer, it phoned his office on July 21, 2008 and learned that Dr. Spencer was out of the office until sometime in August. (AR 7-8.) Hartford informed Plaintiff on July 21, 2008 that it needed clarification on her functionality from Dr. Spencer, and because he had not responded to Hartford's requests for more information, it would need another 45 days to complete the review of her appeal. (AR 63.)

     Plaintiff sent Hartford a letter on August 1, 2008 acknowledging Hartford's request for additional time. (AR 61.) In her letter, Plaintiff also informed Hartford that her condition "continues to deteriorate" and that she was rendered partially immobile during the first week of July. (AR 61.) Plaintiff stated that she visited Dr. Spencer on July 10, 2008, was suffering from severe back spasms, that there was a grinding sensation in her neck. (AR 61.) According to the letter, Plaintiff had resumed physical therapy and started on new medication, Soma, for her back spasms. (AR 61.)

     Dr. Spencer responded to Hartford's June 27, 2009 inquiry on August 7, 2008. (AR 60.) In his response, Dr. Spencer stated that Plaintiff was not able to perform a sedentary occupation that includes the ability to alternate sitting and standing. (AR 60.) When asked to provide his clinical rationale, Dr. Spencer wrote that Plaintiff "cannot work an 8 hour day with standing and sitting." (AR 60.) Hartford's appeal specialist reviewed Plaintiff's August 1, 2008 letter and Dr. Spencer's August 7, 2008 response to its inquiry. (AR 7.) The appeal specialist decided to refer the file for an independent record review by an orthopedic specialist and requested that the independent reviewer call Dr. Spencer to discuss Dr. Spencer's opinions concerning Plaintiff's medical situation and functionality. (AR 7, 57-58.)

The independent record review was sent to Reliable Review Services ("RRS") on August 8, 2008. (AR 57-58.) On that same date, Hartford wrote to Dr. Spencer notifying him that a physician with RRS would be contacting him and asking for Dr. Spencer's cooperation. (AR 55.) Hartford's letter to Dr. Spencer indicated that if the RRS physician was unable to speak with Dr. Spencer, Hartford would "base our decision on documentation currently contained in our file." (AR 55.) Plaintiff was not told of the referral to RRS or that Hartford wanted its independent reviewer to speak with Dr. Spencer.

When the first orthopedic specialist assigned by RRS to the review was unable to complete the assignment, it was reassigned to Dr. William Andrews, an orthopedic surgeon, on August 19, 2008. (AR 6.) RRS notified Hartford of the reassignment and indicated that despite the change, the review would be completed by August 22, 2008, or August 25, 2008 at the latest. (AR 6.) Dr. Andrews reviewed the file and left messages for Dr. Spencer on August 19, 20, and 21, but never heard back from Dr. Spencer. The file Dr. Andrews reviewed did not include the PDA, the information provided by Plaintiff in her August 1, 2008 letter concerning the July 10, 2008 visit to Dr. Spencer, and the fact that Plaintiff had been prescribed Soma for her muscle spasms. (AR 51.) Dr. Andrews issued his report on August 21, 2008. (AR 51-52.) Dr. Andrews concluded that he disagreed with Dr. Spencer's opinion that Plaintiff was unable to perform a sedentary occupation with the ability to alternate sitting and standing as needed. (AR 52.) Specifically, Dr. Andrews stated:

> Ms. Herceg has spinal stenosis with no surgical lesion and no neurologic deficit. The claimant is capable of working in a sedentary capacity if she is allowed to change position as needed for comfort. Typically, stenotic individuals have increasing pain with prolonged maintenance of a certain position, either standing or sitting. If she is allowed to change position as her discomfort demands, she would be able to be productive in a work situation and she would not worsen her stenosis.

1  (AR 52.) Plaintiff was not told that Hartford's independent reviewer had been unable to
2  speak with Dr. Spencer.
3     On August 21, 2008, the same day it received the report from Dr. Andrews, and
4  despite the fact that two weeks remained on the 45 day extension Hartford had requested,
5  Hartford formally denied Plaintiff's appeal. (AR 48-49.) Only in the denial was Plaintiff
6  told of the unsuccessful attempts to contact Dr. Spencer. (AR 49.) The denial letter
7  informed Plaintiff that it was Hartford's determination that:

> [T]he medical evidence on file does not support that you were
> unable to perform the essential duties of your occupation when
> you ceased working on 1/18/08. Dr. Andrews indicated that you
> would be capable of working in a sedentary capacity if you were
> permitted to change position . . . as needed for comfort, and your
> employer has advised us that you are able to alternate sitting and
> standing as needed at work. Although your physicians continue
> to treat your medical condition, the medical evidence on file
> does not support that you were unable to perform the essential
> duties of your occupation when you ceased working on 1/18/08.
> Accordingly, our appeal review concludes that you were not
> Totally Disabled when you ceased working on 1/18/08. Your
> claim remains closed and no benefits are payable.

(AR 49.) Plaintiff was advised that she had exhausted her administrative remedies, that no further review would be conducted, and that she could bring a civil action under ERISA. (AR 49.)

After her appeal was denied, Plaintiff obtained counsel. Plaintiff's attorney wrote to Hartford on October 27, 2008 arguing that Hartford's review of Plaintiff's claim suffered from procedural irregularities and requesting that Hartford re-open Plaintiff's appeal. (Collins Decl., Ex. 2.) Along with the letter, Plaintiff's counsel included a September 24, 2008 letter from Dr. Spencer responding to the opinion of Dr. Andrews and Dr. Spencer's

treatment notes from Plaintiff's July 10, 2008 and September 3, 2008 visits to Dr. Spencer's office. (Id.) Hartford, stating that it had closed the file and would conduct no further review, returned Plaintiff's counsel's letter and the supporting documentation in a letter dated November 12, 2008. (AR 41.) Plaintiff commenced this action on December 9, 2008. Plaintiff's counsel subsequently requested that the Administrative Record be augmented to include her October 27, 2008 letter and supporting documentation. The Court, on May 11, 2009, stated that it would defer ruling on Plaintiff's request until the trial.

## II.     Jurisdiction and Venue

This action involves a claim for long term disability benefits under an employee welfare benefit plan regulated by ERISA. As such, the Court has original jurisdiction over this matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). See, e.g., Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 63, 107 S. Ct. 1542, 1546, 95 L. Ed. 2d 55 (1987); Parrino v. FHP, Inc., 146 F.3d 699, 703-04 (9th Cir. 1998). Venue in the United States District Court for the Central District of California is invoked pursuant to 29 U.S.C. § 1132(e)(2). The parties do not dispute the facts requisite to federal jurisdiction and venue.

## III.    Standard of Review

A "denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989); Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 866 (9th Cir. 2008). Where the plan vests such discretionary authority in the administrator or fiduciary, the Court reviews the denial of benefits under the plan for an abuse of discretion. Firestone, 489 U.S. at 115, 109 S. Ct. at 957. However, in order for the abuse of discretion standard to apply, the Plan must unambiguously grant discretion to the administrator or fiduciary. Kearney v. Standard Ins. Co., 175 F.3d 1084, 1089 (9th Cir. 1999).

In this case, the policy confers discretionary authority on Hartford. Specifically, the STD policy states that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (AR 113.) The Court concludes that the foregoing language unambiguously grants discretion to Hartford.

Once the Court concludes that the policy vests discretionary authority in the administrator or fiduciary, the Court must determine whether the administrator or fiduciary is operating under a conflict of interest. In recent decisions, first the Ninth Circuit, and then the Supreme Court, determined that the abuse of discretion standard still applies even when the administrator has a conflict of interest. See Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2346, 171 L. Ed. 2d 299 (2008) ("Often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket. We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case."); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 965 (2006) ("Abuse of discretion review applies to a discretion-granting plan even if the administrator has a conflict of interest. But Firestone also makes clear that the existence of a conflict of interest is relevant to how a court conducts abuse of discretion review.").

Where, as here, an insurer "acts as both the plan administrator and the funding source for benefits," the insurer "operates under what may be termed a structural conflict of interest." Abatie, 458 F.3d at 965. In the case of such a structural conflict of interest, the Court is to apply an abuse of discretion review which is "tempered by skepticism commensurate with the plan administrator's conflict of interest." Id. at 968. As the Supreme Court explained:

> We believe that Firestone means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit

>denials, they will often take account of several different considerations of which a conflict of interest is one. . . . In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance.

Glenn, 128 S. Ct. at 2351; see also Abatie, 458 F.3d at 968 ("A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage. An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might."); id. at 968-69 ("The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.") (internal citations omitted).

"What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." Abatie, 458 F. 3d at 969. In other words, "[a] district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage." Id. at 968; Saffon, 522 F.3d at 868-69. "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must

rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." Abatie, 458 F.3d at 970.

## IV. Analysis

Other than Hartford's admission that it acts as both the funding source and the administrator, Plaintiff has submitted no facts concerning the extent of Hartford's conflict of interest or a history of questionable claims-handling practices. See Saffon, 522 F.3d at 868. As the record indicates, however, Hartford's claims examiner appears to have made her decision to deny benefits even before receiving the PDA that she viewed as a "beneficial" piece of information. Moreover, at several stages, Hartford misstated facts in ways that weakened Plaintiff's claim. For instance, the Administrative Record repeatedly and erroneously states that Plaintiff did not see Dr. Spencer until February 6, 2008, even though she stopped working on January 18, 2008. But as Dr. Spencer's records establish, it was Dr. Spencer who, during a December 5, 2007 office visit, recommended that Plaintiff try taking some time off work to see if her condition improved.

Additionally, although Hartford wanted its independent reviewer to contact Dr. Spencer, it never informed Plaintiff of this fact. Instead, after not hearing from Dr. Spencer after just three days, and although it still had two weeks within which to complete its consideration of Plaintiff's appeal, Hartford denied the appeal without first providing Plaintiff with an opportunity to facilitate a discussion Hartford believed would assist its determination. See Saffon, 522 F.3d at 873 n.4 ("A doctor is not a lawyer; though he may provide information that is relevant to a claimant's disability, his actions (or inaction) cannot bind the client. If a claims administrator communicates with a doctor who has treated a beneficiary, it must disclose that fact to the patient at a meaningful time."). Indeed, until Plaintiff received Hartford's letter denying her appeal, she was never told that her claim was being reviewed by an independent reviewer. As a result, Plaintiff never had an opportunity to respond to the conclusions contained in the report prepared by Dr. Andrews. See Abatie, 458 F.3d at 974 ("Accordingly, an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review,

1  contravenes the purpose of ERISA. This procedural violation must be weighed by the
2  district court in deciding whether [the administrator] abused its discretion.").

3        In light of the these irregularities in the claims-handling process and Hartford's
4  structural conflict of interest, the Court concludes that it must review Hartford's decision to
5  deny Plaintiff's STD claim with a moderate level of skepticism.

6        Hartford's denial was based primarily on its view that the medical evidence did not
7  indicate that Plaintiff's degenerative disc disease and stenosis, a diagnosis Hartford does not
8  dispute, was not severe enough constitute a "Total Disability" under the STD policy because
9  Plaintiff's employer stated that Plaintiff could alternate between sitting and standing as
10 needed. The problem with Hartford's reliance on CSC's statement that Plaintiff could
11 alternate between sitting and standing is that CSC also said that Plaintiff's job typically
12 involves seven hours of sitting a day for periods of up to three hours at a time. Hartford
13 made no effort to reconcile this conflicting information. It is therefore unclear how the
14 ability to stand for what would presumably be short periods of time would allow Plaintiff to
15 continue working at a job where she would typically spend seven hours a day sitting and
16 using a computer.

17       Hartford's focus on the ability to alternate sitting and standing, while ignoring that
18 nearly 90% of Plaintiff's typical work day involved sitting, is reflected in the referral to its
19 independent record reviewer. In that referral, Hartford asked the reviewer assigned by RSS
20 to advise it if he agreed with Dr. Spencer's opinion that Plaintiff "cannot perform a
21 sedentary occupation with the ability to alternate sitting and standing as needed." Because
22 Dr. Andrews was not provided with the PDA provided by CSC, Dr. Andrews was apparently
23 not aware that Plaintiff's job typically entailed sitting for three hours at a time and seven
24 hours a day. That Plaintiff's job involved so much sitting seems to be an important variable
25 for which Hartford and its independent reviewer did not adequately account. As a result, the
26 opinion of Dr. Andrews fails to provide persuasive support for Hartford's decision to deny
27 Plaintiff's claim for STD benefits.

28

1   For all of the foregoing reasons, and reviewing the Administrative Record in light of the deference to which Hartford's decision is entitled, the Court concludes that Hartford abused its discretion when it denied Plaintiff's claim for STD benefits. Because the Court has reached that conclusion without relying on the additional information contained in Plaintiff's counsel's October 27, 2008 letter to Hartford, the Court denies Plaintiff's request to augment the Administrative Record as moot.

Because the payment of STD benefits is a prerequisite to the payment of LTD benefits, Hartford's denial of Plaintiff's STD claim meant that it never processed an LTD claim for Plaintiff. Although Plaintiff has requested that the Court address the merits of her claim for LTD benefits, the Court declines to do so because a determination as to the entitlement to LTD benefits should be made, in the first instance, by Hartford. To the extent Plaintiff's Complaint seeks a declaration that she is entitled to LTD benefits, that claim is dismissed as premature.

### Conclusion

For all of the foregoing reasons, the Court finds that Hartford abused its discretion when it denied Plaintiff's claim for STD benefits. Based on the Administrative Record, the Court concludes that Plaintiff is "Totally Disabled" for purposes of entitlement to STD benefits. Accordingly, the Court will enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

DATED: September 8, 2009

                                                 Percy Anderson
                                      UNITED STATES DISTRICT JUDGE