1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 | CAROL HERCEG,                           No. CV 08-8117 PA (VBKx)

12 |          Plaintiff,                      FINDINGS OF FACT AND
                                             CONCLUSIONS OF LAW
13 |     v.

14 | HARTFORD LIFE & ACCIDENT
    | INSURANCE COMPANY,
15 | COMPUTER SCIENCES
    | CORPORATION ("CSC") GROUP
16 | INSURANCE PLANS,

17 |          Defendants.

18

19

20          This is an Employee Retirement Income Security Act ("ERISA") action for recovery

21   of long-term disability benefits.  Plaintiff Carol Herceg ("Plaintiff") seeks benefits under a

22   group insurance policy issued to Computer Sciences Corporation ("CSC") by Hartford Life

23   and Accident Insurance Company ("Hartford").  On September 8, 2009, following the filing

24   of the Administrative Record and briefing by the parties, the Court, sitting without a jury,

25   conducted a bench trial.  Having considered the materials submitted by the parties and

26   reviewed the evidence, the Court makes the following findings of fact and conclusions of

27   law pursuant to Federal Rule of Civil Procedure 52(a):

28

## I.        Factual and Procedural Background

Plaintiff, who is now 60 years old, was employed by CSC for eleven years as a senior finance manager.  As a CSC employee, Plaintiff had purchased short term disability ("STD") and long term disability ("LTD") coverage through Hartford.  The STD policy featured a 30 day elimination period and the LTD policy had a 180 day elimination period. (Administrative Record ("AR") 96.)  The STD policy provides a weekly benefit of 60% of pre-disability earnings for a maximum of 26 weeks.  (AR 105.)  The STD policy defines "Total Disability" and "Totally Disabled" as meaning "that you are prevented by: 1. accidental bodily injury; 2. sickness; 3. Mental Illness; 4. Substance Abuse; or 5. pregnancy, from performing the essential duties of your occupation, and as a result, you are earning less than 20% of your pre-disability Weekly Earnings."  (AR 115.)  The STD policy states that Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy."  (AR 113.)

Plaintiff was first treated for back pain by Dr. Curtis Spencer, an orthopedic surgeon, in 1997.  (AR 98.)  In October 2007, Plaintiff returned to Dr. Spencer with complaints of chronic lower back pain and intermittent pain in her left leg.  (AR 87.)  An x-ray revealed multilevel degenerative disc disease.  (AR 87.)  Dr. Spencer prescribed anti-inflammatory medication and recommended that Plaintiff begin physical therapy.  (AR 87.)  Dr. Spencer also ordered an MRI that revealed discogenic disease between the L5 and S1 vertebrae with mild bilateral foraminal stenosis and mild to moderate central canal stenosis in the L3 to L5 region.  (AR 84-85.)

Plaintiff saw Dr. Spencer again on December 5, 2007.  At that time, Plaintiff was suffering a moderate amount of pain.  (AR 87.)  Dr. Spencer believed that Plaintiff would be a candidate for injection therapy, but first decided to "hold her out of work for a couple of weeks" to see if her condition improved.  (AR 87.)  Plaintiff took a medical leave beginning on January 18, 2008.  (AR 96.)  Plaintiff next saw Dr. Spencer on February 6, 2008. Following that visit, Dr. Spencer reported that Plaintiff experienced "some relief with being off work" but that she was "really having a difficult time doing any significant sitting."  (AR

86.)  Dr. Spencer concluded that he did not "believe this is something she is going to be able to function with.  I am going to continue to hold her off work and re-evaluate her in a month's time."  (AR 86.)  At Plaintiff's March 6, 2008 appointment with Dr. Spencer, Plaintiff reported that she had improved "a little bit" since being off work, but did not think she would be able "to continue with the kind of work that she does."  (AR 86.)  Dr. Spencer opined that he thought "this is not unreasonable with her degenerative condition and she should probably find a job more in a consulting position where she has the ability to move around freely."  (AR 86.)

Plaintiff filed a claim for STD benefits with Hartford on April 8, 2008.  (AR 96.)  On the attending physician's statement submitted with Plaintiff's claim, Dr. Spencer stated that Plaintiff was "unable to sit for prolonged time, needs ability to move around freely."  (AR 98.)  Dr. Spencer expected that Plaintiff would be able to return to work in two months, but was not sure if she would be able to resume her full duties when she returned.  (AR 96.)  In processing Plaintiff's claim, Hartford sent a letter to Dr. Spencer on April 10, 2008 asking him to forward his office notes from January 18, 2008 to the present and all tests or studies.  (AR 93.)  Hartford also asked Dr. Spencer to verify what had changed in Plaintiff's condition that she could not work as of January 18, 2008, what specific limitations prevented Plaintiff from working, and to describe her current treatment plan.  (AR 93.)

Hartford received Dr. Spencer's response to its inquiries on April 14, 2008.  (AR 15, 89.)  Specifically, Dr. Spencer stated that Plaintiff was first treated in 1997 and returned in October 2007 for chronic low back pain that had become "more frequent and consistent." (AR 89.)  Dr. Spencer explained that Plaintiff "has difficult time doing any significant sitting–no prolonged sitting, needs ability to move around freely."  (AR 89.)  Dr. Spencer notified Hartford that he had prescribed medication and "physical therapy for truncal stabilization."  (AR 89.)  Because Hartford had only asked for his office notes beginning on January 18, 2008, Dr. Spencer forwarded copies of his February 6, 2008 and March 6, 2008 office notes.  (AR 89-91.)  Hartford then determined that it needed additional information and telephoned Dr. Spencer's office requesting his complete office notes and Plaintiff's

1   imaging studies.  (AR 14-15.)  On April 17, 2008, Hartford notified Plaintiff of its need for

2   this additional information and explained that it would close the claim if Dr. Spencer did not

3   respond by April 30, 2008.  (AR 14.)

4   　　　　The medical information provided by Dr. Spencer was reviewed by Hartford, first by

5   a claims analyst and then a registered nurse.  (AR 13-14.)  The claims analyst incorrectly

6   noted that Plaintiff's "[f]unctional impairment unclear as [claimant] worked with condition

7   since [diagnosis] of 10/07."  (AR 13.)  This was incorrect because Plaintiff stopped working

8   on January 18, 2008.  The nurse who reviewed the file erred when she commented that

9   Plaintiff "stopped working on 1/17/08, however, was not seen by [the attending physician]

10  until 2/6/08."  (AR 13.)  In fact, Dr. Spencer had seen Plaintiff in October and December of

11  2007, and during the December 2007 visit, had recommended that Plaintiff take time off

12  from work.  Therefore, to the extent Hartford believed that Plaintiff had stopped work before

13  consulting with Dr. Spencer, an argument repeated in Hartford's Reply Trial Brief,[1]

14  Hartford was and is mistaken.

15  　　　　The nurse opined that a physical demands analysis ("PDA") would be beneficial.  (AR

16  13.)  CSC returned the completed PDA to Hartford on April 30, 2008.  (AR 77.)  However,

17  on April 29, 2008, prior to receiving the PDA, Hartford's claims examiner had already

18  recommended that Plaintiff's claim be denied.  (AR 12.)  Once it arrived, the PDA disclosed

19  that Plaintiff's job required her to sit for three hours at a time and that it was typical for her

20  to sit for seven hours a day.  (AR 78.)  Plaintiff would walk a half-hour each day and stand

21  for another half-hour during a typical work day.  (AR 78.)  According to CSC, Plaintiff

22  could alternate sitting and standing as needed, but the job could not be modified.  (AR 78.)

23  After reviewing the PDA, Hartford's examiner reiterated her initial conclusion and denied

24  Plaintiff's claim.  (AR 11.)

25

26  ──────────────

27  [1]    See Hartford's Reply Trial Brief at 3 ("Indeed, it does not appear that Dr. Spencer
28  was even aware of Herceg's unilateral decision to go out on disability in January of 2008
    before it occurred.").

Hartford's May 1, 2008 letter denying Plaintiff's claim cited the STD policy's definition of "Total Disability" and reviewed the information considered by Hartford.  (AR 74-76.)  Hartford concluded that:

> Disability is established when there is impairment to your function that renders you unable to perform the essential duties of your occupation.  Although you continue to have complaints of back pain and are receiving treatment, you stopped working 1/18/08 but were not seen by Dr. Spencer until 2/6/08.  Dr. Spencer indicated treatment as medication and physical therapy, however, physical therapy notes have not been provided and there is no mention of therapy in the 2008 office visit notes. This would not indicate a level of treatment consistent with a severity of symptoms that would preclude functioning.  The Physical Demands Analysis received from your employer on 4/30/08 indicates that your job includes a sit stand option and the restrictions of no prolonged sitting and ability to move around freely are within the scope of your job.  We are not disputing your reported symptoms.  However, reported symptoms and treatment alone is not indicative of a disability.  The medical evidence must be able to substantiate a functional impairment that would prevent you from working.

(AR 75.)  Hartford's letter informed Plaintiff of her right to seek an appeal and advised her that if she chose to appeal, Hartford would review her entire claim, including any new information received with her appeal.  (AR 76.)

Plaintiff wrote to Hartford on June 6, 2008 appealing Hartford's denial of her STD claim.  (AR 70-72.)  In her appeal, Plaintiff included contact information for her physical therapist but did not forward any physical therapy records.  (AR 70-72.)  Hartford's appeal specialist reviewed Plaintiff's appeal letter and the file and determined that Hartford should

ask Dr. Spencer to opine about the PDA's indication that Plaintiff could alternate sitting and standing.  (AR 8-9.)  Hartford wrote to Dr. Spencer on June 27, 2009 asking if Plaintiff "is capable of performing a sedentary occupation which includes the ability to alternate sitting and standing as needed?"  (AR 29.)  Dr. Spencer was asked to provide his clinical rationale if his answer was "no."  (AR 29.)  When Hartford did not receive a response from Dr. Spencer, it phoned his office on July 21, 2008 and learned that Dr. Spencer was out of the office until sometime in August.  (AR 7-8.)  Hartford informed Plaintiff on July 21, 2008 that it needed clarification on her functionality from Dr. Spencer, and because he had not responded to Hartford's requests for more information, it would need another 45 days to complete the review of her appeal.  (AR 63.)

Plaintiff sent Hartford a letter on August 1, 2008 acknowledging Hartford's request for additional time.  (AR 61.)  In her letter, Plaintiff also informed Hartford that her condition "continues to deteriorate" and that she was rendered partially immobile during the first week of July.  (AR 61.)  Plaintiff stated that she visited Dr. Spencer on July 10, 2008, was suffering from severe back spasms, that there was a grinding sensation in her neck.  (AR 61.)  According to the letter, Plaintiff had resumed physical therapy and started on new medication, Soma, for her back spasms.  (AR 61.)

Dr. Spencer responded to Hartford's June 27, 2009 inquiry on August 7, 2008.  (AR 60.)  In his response, Dr. Spencer stated that Plaintiff was not able to perform a sedentary occupation that includes the ability to alternate sitting and standing.  (AR 60.)  When asked to provide his clinical rationale, Dr. Spencer wrote that Plaintiff "cannot work an 8 hour day with standing and sitting."  (AR 60.)  Hartford's appeal specialist reviewed Plaintiff's August 1, 2008 letter and Dr. Spencer's August 7, 2008 response to its inquiry.  (AR 7.)  The appeal specialist decided to refer the file for an independent record review by an orthopedic specialist and requested that the independent reviewer call Dr. Spencer to discuss Dr. Spencer's opinions concerning Plaintiff's medical situation and functionality.  (AR 7, 57-58.)

The independent record review was sent to Reliable Review Services ("RRS") on August 8, 2008.  (AR 57-58.)  On that same date, Hartford wrote to Dr. Spencer notifying him that a physician with RRS would be contacting him and asking for Dr. Spencer's cooperation.  (AR 55.)  Hartford's letter to Dr. Spencer indicated that if the RRS physician was unable to speak with Dr. Spencer, Hartford would "base our decision on documentation currently contained in our file."  (AR 55.)  Plaintiff was not told of the referral to RRS or that Hartford wanted its independent reviewer to speak with Dr. Spencer.

When the first orthopedic specialist assigned by RRS to the review was unable to complete the assignment, it was reassigned to Dr. William Andrews, an orthopedic surgeon, on August 19, 2008.  (AR 6.)  RRS notified Hartford of the reassignment and indicated that despite the change, the review would be completed by August 22, 2008, or August 25, 2008 at the latest.  (AR 6.)  Dr. Andrews reviewed the file and left messages for Dr. Spencer on August 19, 20, and 21, but never heard back from Dr. Spencer.  The file Dr. Andrews reviewed did not include the PDA, the information provided by Plaintiff in her August 1, 2008 letter concerning the July 10, 2008 visit to Dr. Spencer, and the fact that Plaintiff had been prescribed Soma for her muscle spasms.  (AR 51.)  Dr. Andrews issued his report on August 21, 2008.  (AR 51-52.)  Dr. Andrews concluded that he disagreed with Dr. Spencer's opinion that Plaintiff was unable to perform a sedentary occupation with the ability to alternate sitting and standing as needed.  (AR 52.)  Specifically, Dr. Andrews stated:

> Ms. Herceg has spinal stenosis with no surgical lesion and no
> neurologic deficit.  The claimant is capable of working in a
> sedentary capacity if she is allowed to change position as needed
> for comfort.  Typically, stenotic individuals have increasing pain
> with prolonged maintenance of a certain position, either standing
> or sitting.  If she is allowed to change position as her discomfort
> demands, she would be able to be productive in a work situation
> and she would not worsen her stenosis.

1    (AR 52.)  Plaintiff was not told that Hartford's independent reviewer had been unable to

2    speak with Dr. Spencer.

3         On August 21, 2008, the same day it received the report from Dr. Andrews, and

4    despite the fact that two weeks remained on the 45 day extension Hartford had requested,

5    Hartford formally denied Plaintiff's appeal.  (AR 48-49.)  Only in the denial was Plaintiff

6    told of the unsuccessful attempts to contact Dr. Spencer.  (AR 49.)  The denial letter

7    informed Plaintiff that it was Hartford's determination that:

8              [T]he medical evidence on file does not support that you were

9              unable to perform the essential duties of your occupation when

10             you ceased working on 1/18/08.  Dr. Andrews indicated that you

11             would be capable of working in a sedentary capacity if you were

12             permitted to change position . . . as needed for comfort, and your

13             employer has advised us that you are able to alternate sitting and

14             standing as needed at work.  Although your physicians continue

15             to treat your medical condition, the medical evidence on file

16             does not support that you were unable to perform the essential

17             duties of your occupation when you ceased working on 1/18/08.

18             Accordingly, our appeal review concludes that you were not

19             Totally Disabled when you ceased working on 1/18/08.  Your

20             claim remains closed and no benefits are payable.

21   (AR 49.)  Plaintiff was advised that she had exhausted her administrative remedies, that no

22   further review would be conducted, and that she could bring a civil action under ERISA.

23   (AR 49.)

24        After her appeal was denied, Plaintiff obtained counsel.  Plaintiff's attorney wrote to

25   Hartford on October 27, 2008 arguing that Hartford's review of Plaintiff's claim suffered

26   from procedural irregularities and requesting that Hartford re-open Plaintiff's appeal.

27   (Collins Decl., Ex. 2.)  Along with the letter, Plaintiff's counsel included a September 24,

28   2008 letter from Dr. Spencer responding to the opinion of Dr. Andrews and Dr. Spencer's

1   treatment notes from Plaintiff's July 10, 2008 and September 3, 2008 visits to Dr. Spencer's

2   office.  (Id.)  Hartford, stating that it had closed the file and would conduct no further

3   review, returned Plaintiff's counsel's letter and the supporting documentation in a letter

4   dated November 12, 2008.  (AR 41.)  Plaintiff commenced this action on December 9, 2008.

5   Plaintiff's counsel subsequently requested that the Administrative Record be augmented to

6   include her October 27, 2008 letter and supporting documentation.  The Court, on May 11,

7   2009, stated that it would defer ruling on Plaintiff's request until the trial.

8   **II.    Jurisdiction and Venue**

9          This action involves a claim for long term disability benefits under an employee

10  welfare benefit plan regulated by ERISA.  As such, the Court has original jurisdiction over

11  this matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).  See, e.g., Metro. Life Ins. Co.

12  v. Taylor, 481 U.S. 58, 63, 107 S. Ct. 1542, 1546, 95 L. Ed. 2d 55 (1987); Parrino v. FHP,

13  Inc., 146 F.3d 699, 703-04 (9th Cir. 1998).  Venue in the United States District Court for the

14  Central District of California is invoked pursuant to 29 U.S.C. § 1132(e)(2).  The parties do

15  not dispute the facts requisite to federal jurisdiction and venue.

16  **III.   Standard of Review**

17         A "denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed

18  under a de novo standard unless the benefit plan gives the administrator or fiduciary

19  discretionary authority to determine eligibility for benefits or to construe the terms of the

20  plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57,

21  103 L. Ed. 2d 80 (1989); Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d

22  863, 866 (9th Cir. 2008).  Where the plan vests such discretionary authority in the

23  administrator or fiduciary, the Court reviews the denial of benefits under the plan for an

24  abuse of discretion.  Firestone, 489 U.S. at 115, 109 S. Ct. at 957.  However, in order for the

25  abuse of discretion standard to apply, the Plan must unambiguously grant discretion to the

26  administrator or fiduciary.  Kearney v. Standard Ins. Co., 175 F.3d 1084, 1089 (9th Cir.

27  1999).

28

1    In this case, the policy confers discretionary authority on Hartford.  Specifically, the

2   STD policy states that Hartford has "full discretion and authority to determine eligibility for

3   benefits and to construe and interpret all terms and provisions of the Group Insurance

4   Policy."  (AR 113.)  The Court concludes that the foregoing language unambiguously grants

5   discretion to Hartford.

6    Once the Court concludes that the policy vests discretionary authority in the

7   administrator or fiduciary, the Court must determine whether the administrator or fiduciary

8   is operating under a conflict of interest.  In recent decisions, first the Ninth Circuit, and then

9   the Supreme Court, determined that the abuse of discretion standard still applies even when

10   the administrator has a conflict of interest.  See Metro. Life Ins. Co. v. Glenn, 128 S. Ct.

11   2343, 2346, 171 L. Ed. 2d 299 (2008) ("Often the entity that administers the plan, such as an

12   employer or an insurance company, both determines whether an employee is eligible for

13   benefits and pays benefits out of its own pocket.  We here decide that this dual role creates a

14   conflict of interest; that a reviewing court should consider that conflict as a factor in

15   determining whether the plan administrator has abused its discretion in denying benefits; and

16   that the significance of the factor will depend upon the circumstances of the particular

17   case."); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 965 (2006) ("Abuse of

18   discretion review applies to a discretion-granting plan even if the administrator has a conflict

19   of interest.  But Firestone also makes clear that the existence of a conflict of interest is

20   relevant to how a court conducts abuse of discretion review.").

21    Where, as here, an insurer "acts as both the plan administrator and the funding source

22   for benefits," the insurer "operates under what may be termed a structural conflict of

23   interest."  Abatie, 458 F.3d at 965.  In the case of such a structural conflict of interest, the

24   Court is to apply an abuse of discretion review which is "tempered by skepticism

25   commensurate with the plan administrator's conflict of interest."  Id. at 968.  As the

26   Supreme Court explained:

27    We believe that Firestone means what the word 'factor' implies,

28    namely, that when judges review the lawfulness of benefit

-10-

1         denials, they will often take account of several different

2         considerations of which a conflict of interest is one. . . . In such

3         instances, any one factor will act as a tiebreaker when the other

4         factors are closely balanced, the degree of closeness necessary

5         depending upon the tiebreaking factor's inherent or case-specific

6         importance.

7  Glenn, 128 S. Ct. at 2351; see also Abatie, 458 F.3d at 968 ("A district court, when faced

8  with all the facts and circumstances, must decide in each case how much or how little to

9  credit the plan administrator's reason for denying insurance coverage.  An egregious conflict

10  may weigh more heavily (that is, may cause the court to find an abuse of discretion more

11  readily) than a minor, technical conflict might."); id. at 968-69 ("The level of skepticism

12  with which a court views a conflicted administrator's decision may be low if a structural

13  conflict of interest is unaccompanied, for example, by any evidence of malice, of

14  self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict

15  more heavily if, for example, the administrator provides inconsistent reasons for denial; fails

16  adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a

17  claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by

18  interpreting plan terms incorrectly or by making decisions against the weight of evidence in

19  the record.") (internal citations omitted).

20       "What the district court is doing in an ERISA benefits denial case is making

21  something akin to a credibility determination about the insurance company's or plan

22  administrator's reason for denying coverage under a particular plan and a particular set of

23  medical and other records."  Abatie, 458 F. 3d at 969.  In other words, "[a] district court,

24  when faced with all the facts and circumstances, must decide in each case how much or how

25  little to credit the plan administrator's reason for denying insurance coverage."  Id. at 968;

26  Saffon, 522 F.3d at 868-69.  "The district court may, in its discretion, consider evidence

27  outside the administrative record to decide the nature, extent, and effect on the

28  decision-making process of any conflict of interest; the decision on the merits, though, must

1   rest on the administrative record once the conflict (if any) has been established, by extrinsic

2   evidence or otherwise."  Abatie, 458 F.3d at 970.

3   **IV.   Analysis**

4          Other than Hartford's admission that it acts as both the funding source and the

5   administrator, Plaintiff has submitted no facts concerning the extent of Hartford's conflict of

6   interest or a history of questionable claims-handling practices.  See Saffon, 522 F.3d at 868.

7   As the record indicates, however, Hartford's claims examiner appears to have made her

8   decision to deny benefits even before receiving the PDA that she viewed as a "beneficial"

9   piece of information.  Moreover, at several stages, Hartford misstated facts in ways that

10  weakened Plaintiff's claim.  For instance, the Administrative Record repeatedly and

11  erroneously states that Plaintiff did not see Dr. Spencer until February 6, 2008, even though

12  she stopped working on January 18, 2008.  But as Dr. Spencer's records establish, it was Dr.

13  Spencer who, during a December 5, 2007 office visit, recommended that Plaintiff try taking

14  some time off work to see if her condition improved.

15         Additionally, although Hartford wanted its independent reviewer to contact Dr.

16  Spencer, it never informed Plaintiff of this fact.  Instead, after not hearing from Dr. Spencer

17  after just three days, and although it still had two weeks within which to complete its

18  consideration of Plaintiff's appeal, Hartford denied the appeal without first providing

19  Plaintiff with an opportunity to facilitate a discussion Hartford believed would assist its

20  determination.  See Saffon, 522 F.3d at 873 n.4 ("A doctor is not a lawyer; though he may

21  provide information that is relevant to a claimant's disability, his actions (or inaction) cannot

22  bind the client.  If a claims administrator communicates with a doctor who has treated a

23  beneficiary, it must disclose that fact to the patient at a meaningful time.").  Indeed, until

24  Plaintiff received Hartford's letter denying her appeal, she was never told that her claim was

25  being reviewed by an independent reviewer.  As a result, Plaintiff never had an opportunity

26  to respond to the conclusions contained in the report prepared by Dr. Andrews.  See Abatie,

27  458 F.3d at 974 ("Accordingly, an administrator that adds, in its final decision, a new reason

28  for denial, a maneuver that has the effect of insulating the rationale from review,

1    contravenes the purpose of ERISA.  This procedural violation must be weighed by the

2    district court in deciding whether [the administrator] abused its discretion.").

3            In light of the these irregularities in the claims-handling process and Hartford's

4    structural conflict of interest, the Court concludes that it must review Hartford's decision to

5    deny Plaintiff's STD claim with a moderate level of skepticism.

6            Hartford's denial was based primarily on its view that the medical evidence did not

7    indicate that Plaintiff's degenerative disc disease and stenosis, a diagnosis Hartford does not

8    dispute, was not severe enough constitute a "Total Disability" under the STD policy because

9    Plaintiff's employer stated that Plaintiff could alternate between sitting and standing as

10   needed.  The problem with Hartford's reliance on CSC's statement that Plaintiff could

11   alternate between sitting and standing is that CSC also said that Plaintiff's job typically

12   involves seven hours of sitting a day for periods of up to three hours at a time.  Hartford

13   made no effort to reconcile this conflicting information.  It is therefore unclear how the

14   ability to stand for what would presumably be short periods of time would allow Plaintiff to

15   continue working at a job where she would typically spend seven hours a day sitting and

16   using a computer.

17           Hartford's focus on the ability to alternate sitting and standing, while ignoring that

18   nearly 90% of Plaintiff's typical work day involved sitting, is reflected in the referral to its

19   independent record reviewer.  In that referral, Hartford asked the reviewer assigned by RSS

20   to advise it if he agreed with Dr. Spencer's opinion that Plaintiff "cannot perform a

21   sedentary occupation with the ability to alternate sitting and standing as needed."  Because

22   Dr. Andrews was not provided with the PDA provided by CSC, Dr. Andrews was apparently

23   not aware that Plaintiff's job typically entailed sitting for three hours at a time and seven

24   hours a day.  That Plaintiff's job involved so much sitting seems to be an important variable

25   for which Hartford and its independent reviewer did not adequately account.  As a result, the

26   opinion of Dr. Andrews fails to provide persuasive support for Hartford's decision to deny

27   Plaintiff's claim for STD benefits.

28

For all of the foregoing reasons, and reviewing the Administrative Record in light of the deference to which Hartford's decision is entitled, the Court concludes that Hartford abused its discretion when it denied Plaintiff's claim for STD benefits.  Because the Court has reached that conclusion without relying on the additional information contained in Plaintiff's counsel's October 27, 2008 letter to Hartford, the Court denies Plaintiff's request to augment the Administrative Record as moot.

Because the payment of STD benefits is a prerequisite to the payment of LTD benefits, Hartford's denial of Plaintiff's STD claim meant that it never processed an LTD claim for Plaintiff.  Although Plaintiff has requested that the Court address the merits of her claim for LTD benefits, the Court declines to do so because a determination as to the entitlement to LTD benefits should be made, in the first instance, by Hartford.  To the extent Plaintiff's Complaint seeks a declaration that she is entitled to LTD benefits, that claim is dismissed as premature.

### Conclusion

For all of the foregoing reasons, the Court finds that Hartford abused its discretion when it denied Plaintiff's claim for STD benefits.  Based on the Administrative Record, the Court concludes that Plaintiff is "Totally Disabled" for purposes of entitlement to STD benefits.  Accordingly, the Court will enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

DATED: September 8, 2009

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE

-14-